UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

NO. 1:18-CR-00092-MR-WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | MOTION FOR DOWNWARD |
| v. | ) | VARIANCE AND |
| | ) | SENTENCING MEMO |
| JAMES E. MACALPINE, | ) | |
| Defendant. | ) | |

The Defendant, through the undersigned counsel, hereby moves this Honorable Court for a Downward Variance that will permit the Defendant to avoid an active term of imprisonment in the Bureau of Prisons and continue his Orthodontic practice, while making meaningful restitution in this case. In support of this motion, the Defendant states the following and presents his sentencing memorandum:

1. Dr. MacAlpine is a 72-year old practicing orthodontist who has practiced his specialty in the Asheville, North Carolina area since the mid-1970s. By all accounts, he is a fantastic orthodontist who provides superior services at prices below the average for the area, to include complimentary services in hardship instances, all the while giving back to his local community through coat drives, rewards for local children for good grades and school performance, etc. While acknowledging his present offense, with relevant conduct that spans more than 20 years, he has made numerous positive contributions to his local community, as evidenced in the attached five character letters submitted with this document as Attachment 1.

2. Many will ask how an intelligent grown adult professional, who has accomplished in life what Dr. MacAlpine has achieved, could possibly find himself in the situation that we have now. The undersigned submits that Dr. MacAlpine's current difficulties are the result of his unhappiness with the tax system, his gullibility and misguided trust placed in individuals who profited by selling him purported legal

1

documents that supported a base-less, yet apparently valid, challenge to the tax system, and his becoming "stuck" in a "box canyon with no way out." Dr. MacAlpine is not denying that he made numerous poor and voluntary decisions over the years to embrace and follow the anti-tax rhetoric that he initially adopted in the mid-1990s. He did. The individuals he listened to, very smooth talking profiteers who used mis-quoted and misleading "legal precedent" to further their positions, helped him down a path that led him to refuse to file taxes for a number of years and to resist all efforts to cooperate with the Internal Revenue Service (IRS) and the collection of arrearages. They did so while charging him tens of thousands of dollars for the preparation of declarations, statements of intent, and proposed federal pleadings, all the while assuring him that he was legally justified in what he was doing and that he was carrying the banner for the movement to expose the fraudulent federal tax system. They did so without putting themselves in jeopardy while encouraging him down a path that only increased his liability and jeopardy. Dr. MacAlpine explained his dilemma best in his email sent to the North Carolina Dental Board this Spring, attached to his document as Attachment 2.

3. When this Court appointed the undersigned as "standby counsel" for Dr. MacAlpine in late October, 2018, it was immediately apparent to the undersigned that Dr. MacAlpine had been and was still being manipulated by persons most readily identified with the Sovereign Citizens movement. It took more than two months for the undersigned to challenge, refute, and show Dr. MacAlpine the errors of the legal gibberish being funneled to him to file in this case and the futility of proceeding towards a trial and certain protracted incarceration. If only he had retained competent legal counsel earlier in this process, such that the "light" could have come on at a much earlier stage. When the "light" came on at the end of December, 2018, it was clear Dr. MacAlpine understood the misguided path he had chosen and pursued and the situation he was in. The change was immediate and dramatic. He was no longer listening to his previous advisors and counselors, no longer asking the undersigned to review proposed

pleadings, and he was focused on admitting his wrongs and starting on the path to making things right, to the extent he could.

4. In early January, before the start of his scheduled trial, Dr. MacAlpine asked the undersigned to take over his case and move to the traditional role of defense counsel and help him set things right. To that end, the undersigned immediately notified Daniel Bradley, the assigned Assistant United States Attorney (AUSA), of Dr. MacAlpine's decision to change counsel's role and to seek a plea agreement to avoid the pending trial. This was done while the Government was still scrambling to "activate" furloughed IRS employees during a period of Government shutdown to arrange their availability and travel for the pending trial. While late in the trial preparation process, his decision to seek a plea agreement and avoid a protracted document-heavy trial saved the Government enormous amounts of further preparation and trial related costs. Later, in January, a plea agreement was completed and Dr. MacAlpine entered his Guilty plea in early February, 2019.

5. Immediately after his Rule 11 Hearing, Dr. MacAlpine spent a number of hours meeting with the AUSA and three IRS agents. He answered all the questions he could in an attempt to clarify issues and questions they had in a further attempt to right the wrongs he had committed. He also immediately met with the probation department and completed a full-disclosure listing of all his assets. Finally, he immediately set up a client fund to begin making payments into, as he could, so that if he receives an active prison sentence he will be able to partially reimburse some clients whose treatment has been prepaid but not complete.

6. Since his Rule 11 Hearing, Dr. MacAlpine has made every effort to make meaningful restitution in this case. He has trimmed his daily living expenses to the bare necessities (making lifestyle changes and deleting everyday expenses such as a home phone and internet), while selling small household items in an attempt to raise money for his client fund. He has also made monthly payments to the IRS through the District

Court in the amounts of $4,000.00 on March 1, 2019, $4,125.00 on April 1, 2019, and $3,000.00 on May 1, 2019. The latter amount was reduced slightly because of the small loss of business he suffered in April, 2019 following the broadcast of a television story on the local news about his guilty plea, which resulted in several prospective clients withdrawing from his practice. He also presented the AUSA and the IRS with the opportunity to have his brother purchase his share of the partnership that owns the building where he practices and a small land-locked parcel of land located adjacent to his brother's residence. This opportunity resulted in a check for $175,000.00 being sent to the IRS on May 8, 2019 as partial restitution.

7. Dr. MacAlpine has reviewed his current client base and identified the following categories of patients. He has approximately 17 patients who have prepaid their entire orthodontic fee, but who are not finished with their estimated treatment period that extends into the future. As of the end of May, 2019, they would be due a refund of approximately $24,723.00. He has an additional 12 patients who paid for their services and whose estimated time for treatment has lapsed, but who are still in treatment because of continued dental needs that have arisen. He estimates that to complete treatment at another orthodontic office will cost these individuals approximately $8,150.00. For all of the foregoing clients, for all of his pay-as-they go clients, and for the additional 50-75 clients who have completed treatment but who are in "follow-up" monitoring for one year after treatment, they will have to transfer to a new orthodontic practice if Dr. MacAlpine's practice closes, which will mean they will incur a transfer fee imposed by the new orthodontic practice and they will be subject to the higher fees such practices charge. By the end of June, 2019, Dr. MacAlpine hopes to have accumulated almost $30,000.00 in his client fund to be able to make partial restitution to the foregoing clients in the event his practice must close. Should his practice not need to close, the monies in the client fund could be put forth towards restitution.

8. While the Guidelines in this case call for an active prison sentence, even if all of our objections were sustained, a weighing of the costs and benefits of incarceration versus a Court-fashioned probationary sentence (that includes community or home confinement, yet still allows Dr. MacAlpine to continue his practice) favors the latter. Should the Court impose an active prison term:

    a. Dr. MacAlpine's orthodontic practice will close and the building he rents for his practice could potentially lapse into non-use/disrepair;

    b. Dr. MacAlpine's dental license will be lost and he will most likely be unable to reinitiate a dental practice. As a felon without a dental license, future employment opportunities will be greatly reduced, which will affect his ability to make future restitution payments;

    c. Dr. MacAlpine's house will go into foreclosure and the amount of potential restitution generated by its sale will be diminished, if not extinguished;

    d. Dr. MacAlpine's two employees will be out of a job with the resulting financial hardships. One of his employees has had major surgery that causes her to frequently miss work or to have to leave work early, which will make getting another job more difficult. That employee also is a care-giver for her grand-daughter, which requires her to have a flexible work environment to address those needs. The other employee suffers from migraines and occasional forced bed rest to address the issue. Society will suffer from potentially having two less productive people working and paying taxes on their earnings. Should they need to go on unemployment, an additional cost to society is incurred;

    e. Clients of Dr. MacAlpine will suffer financial hardships to the extent they are not fully reimbursed for prepaid treatment or they incur transfer and higher treatment fees at new orthodontic practices. Some of those clients may not be able to afford the transfer and higher fees, which may cause them to forego or delay their needed treatment; and

5

f. The Asheville area will lose one of the few orthodontists who practices a non-extraction based approach to treatment. This approach results in longer treatment times but a better, holistic approach to dentistry. His patients have consistently thanked Dr. MacAlpine and his staff for an approach that avoided unnecessary tooth extraction advocated by prior potential providers.

Should the Court grant a Downward Variance and fashion an appropriate probationary sentence that allows for Dr. MacAlpine to continue his dental practice:

a. All of the foregoing adverse outcomes of a prison sentence are avoided, but Dr. MacAlpine still suffers the punishment aspect of community or home detention, with its restrictions on his liberty;

b. Dr. MacAlpine will be able to continue his practice and can reasonably be able to make meaningful monthly restitution payments to the IRS;

c. Dr. MacAlpines' two employees will be able to continue working for him and earning and paying taxes, without the need to resort to going on unemployment;

d. Dr. MacAlpine's patients can continue with treatment at his practice without losing prepaid services or having to incur additional expenses finding treatment elsewhere; and

e. Dr. MacAlpine's home won't need to go into foreclosure and its future sale should be at a more fair-market-priced amount allowing for maximum payment of restitution to the IRS;

Dr. MacAlpine is willing and desires to keep doing that which he loves, practicing orthodontic dentistry, to continue making restitution payments as part of his desire to right the wrongs he has committed. This is a strong mitigating factor when most men his age are well into full retirement. The undersigned submits that specific deterrence going forward is not needed in Dr. MacAlpine's case—he gets that what he did was wrong and his demonstrated efforts since his plea show he needs not be deterred going forward.

6

While an argument for general deterrence still exists, the costs to society mitigate against it on the specific facts of this case.

9. Concerning the restitution amount in this case, it should be noted that the actual amount of loss to the Government through all of the years of non-payment of taxes is closer to the $1,500,000.00 amount and not the high-end of the applicable Guideline range of $3,500,000.00. While it is true that this Court imposed in 2014 an initial Judgment against Dr. MacAlpine for $1,962,354.11 (for the tax years between 1999 and 2006), that amount is based upon his failure to properly document his claimed expenses and the IRS' denial of all such claims in his taxes. This, even though the IRS had evidence in its possession of payment of most of those expenses, such as the employee costs, which resulted in inflated taxable income and resulting percentage higher penalties and interest. It is true that the Judgment is a problem of Dr. MacAlpine's own making, in that he chose to inappropriately resist and attack the Judgment, and it became fixed as a result of his chosen path of action. Nevertheless, in all fairness, the Court should consider that had his proper deductions not been denied, the actual amount of monies owed at the time of the Judgment would have been approximately one third of the Judgment amount. When one then adds to the actual amount of monies owed for the 1999 to 2006 time frame the amount of taxes owed from 2009 through 2017, one arrives at a figure closer to the $1,500,000.00 amount at the low-end of the current Guideline range.

10. For the foregoing reasons, Dr. MacAlpine urges the Court to not impose an active prison term. Should the Court nevertheless choose to impose an active prison sentence, the undersigned urges the Court to allow Dr. MacAlpine a period of up to 45 days from the date of sentencing for him to self-report to the Bureau of Prisons so that he may complete as much treatment for current clients as possible, shut down his orthodontic practice in the most orderly fashion, and otherwise tie up loose ends before beginning any period of incarceration. The undersigned discussed this request with the

AUSA and the Government did not have an objection to allowing Dr. MacAlpine to self report.

WHEREFORE, the Defendant, through undersigned counsel moves this Court for a Downward Variance that allows Dr. MacAlpine to be placed on probation with some form of community or home detention while avoiding an active prison sentence.

Respectfully submitted, this the 28th day of May, 2019.

NUNLEY & ASSOCIATES, P.L.L.C.

*Robert E. Nunley*
Robert E. Nunley
Defense Counsel
P.O. Box 111
Green Mountain, NC 28740
(919) 616-8545
North Carolina Bar # 25905
marinejudge@gmail.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was served via CM/ECF upon:

Daniel V. Bradley
Assistant United States Attorney for the Western District of North Carolina
United States Attorney's Office
Federal Courthouse
100 Otis Street
Asheville, NC 28801

Additionally, a copy of the foregoing was served on the Defendant via email this date and a copy will be hand-delivered to the Defendant tomorrow morning.

Respectfully submitted, this the 28th day of May, 2019.

*Robert E. Nunley*
Robert E. Nunley
Defense Counsel

8

Case 1:18-cr-00092-MR-WCM   Document 55   Filed 05/28/19   Page 8 of 8